**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
PHILLIP MURPH,

                   Petitioner,

       -against-

UNITED STATES OF AMERICA,

                   Respondent.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
13-cv-2594 (ADS)

<u>**APPEARANCES:**</u>

**Fahringer & Dubno**
*Attorneys for the Petitioner*
120 East 56 Street
Suite 1150
New York, NY 10022
    By: Herald Price Fahringer, Esq.
        Erica Tamar Dubno, Esq.
        Nicole Neckles, Esq., of Counsel

**Loretta E. Lynch, United States Attorney for the Eastern District of New York**
*Attorneys for the Respondent*
610 Federal Plaza
Central Islip, NY 11722
    By: Charles N. Rose, Esq.,
        Lara Treinis Gatz, Esq., of Counsel

**Spatt, J.**

      The Petitioner Phillip Murph (the "Petitioner"), presently incarcerated at the Federal

Correctional Facility in Edgefield, South Carolina, brings this petition for a writ of habeas corpus

under 28 U.S.C. § 2255 to vacate, set aside, or correct his judgment of conviction and sentence.

The Petitioner is currently serving a twenty-year sentence imposed by the Honorable Leonard D.

Wexler after a jury found him guilty of (1) attempt to distribute and possess with intent to

distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(c), and (2) conspiracy

to distribute and possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(B)(ii)(II).

Here, the Petitioner argues that that he was denied effective assistance of counsel because (1) his pre-trial counsel, Frank Murphy, allowed him to proffer with the Government, in the hope of obtaining a cooperation agreement, without knowing the specific holding of United States v. Barrow, 400 F.3d 109 (2d Cir. 2005) or advising the Petitioner about the holding of that specific case; (2) his retained attorney, Thomas Liotti, had purported hearing difficulties at the second trial; and (3) Liotti failed to object to an improper sentencing enhancement contained in a proposed plea agreement with the Government.

For the reasons set forth, the Court denies the Petitioner's habeas petition.

## I.    BACKGROUND

On May 1, 2008, the Petitioner was arrested pursuant to a warrant.  No drugs were found in his possession when he was arrested.  Later that day, the Petitioner appeared on a complaint charging him with conspiracy to possess and distribute 200 grams of cocaine on March 12, 2008, in violation of 21 U.S.C. § 846.  United States Magistrate Judge Arlene R. Lindsay appointed Francis Murphy, Esq., under the Criminal Justice Act, to represent the Petitioner.

On May 19, 2008, the Petitioner, on Murphy's advice, attended a proffer session with Special Assistant United States Attorney Kenneth St. Bernard; Drug Enforcement Agency ("DEA") Special Agent Brian Fitzpatrick; DEA Task Force Officer Jeff Boletteri; and Internal Revenue Service Special Agent Gerald Ricchardi.  Prior to the beginning of the Proffer Session, the Petitioner, with the assistance of counsel, reviewed and signed an agreement acknowledging his knowing and voluntary participation in the Proffer Session.

The Proffer Agreement stated that "the Office will not offer in evidence any statements made by the [Petitioner] at the Meeting (A) in its case-in-chief or (B) at sentencing." The Proffer Agreement further provided that "the Office may use any statement made by [the Petitioner] . . . (B) as substantive evidence to cross-examine [the Petitioner], should [the Petitioner] testify, and (C) as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the Petitioner] at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing)." The Proffer Agreement provided that the "Fed. R. Evid. 410 do[es] not apply to any statements made by [the Petitioner] at the Meeting, and [the Petitioner] shall not assert any claim under these or any other provisions of law that such statements or any leads therefrom should be suppressed."

During the Proffer Session, the Petitioner acknowledged engaging in certain narcotics transactions with other defendants named in the complaint. In particular, the Petitioner admitted, among other things, to (1) engaging in cocaine and marijuana transactions and (2) knowingly providing numerous drug dealers with cellular telephones through his cell phone store. Attorney Murphy concedes that, at the time of this proffer session, he was unaware of the holding by the Second Circuit in Barrow, which defines the circumstances under which the prosecution may use a defendant's proffer statements as substantive evidence against him at trial.

On June 3, 2008, the Petitioner discharged Murphy. Sometime thereafter, the Petitioner retained Thomas Liotti, to represent him. On June 11, 2008, Liotti's associate, Drummond C. Smith, Esq., attended a second proffer session with the Petitioner and the Government. That meeting ended prematurely when Smith advised the Petitioner not to answer any questions. The Government subsequently had several telephone conversations with Smith, during which Smith was advised that the Petitioner could continue to meet with the Government in the hope of

obtaining a cooperation agreement, or face indictment. On several occasions, Smith requested that the Government refrain from presenting the Petitioner's case to the grand jury.

However, because it was clear to the Government that the Petitioner no longer wished to cooperate, a decision was made on July 23, 2008 to present the Petitioner's case to the grand jury. On July 30, 2008, a grand jury returned the first superseding indictment against the Petitioner. The Petitioner was charged with conspiracy to distribute 200 grams of cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1) (C).

On December 9, 2008, the case was transferred from United States District Judge Thomas C. Platt to United States District Judge Leonard D. Wexler.

On December 16, 2008, the Government obtained a second superseding indictment, which replaced the charge in the first superseding indictment with two new charges: namely, attempt to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(C) and 18 U.S.C. § 2; and conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(ii)(II).

On December 31, 2008, the Government filed a letter under seal, which Judge Wexler subsequently unsealed, indicating that the Government intended to use Petitioner's Proffer admissions in the event the Petitioner triggered any of the exceptions to the Proffer Agreement signed by the parties. The Government explained the various ways under Barrow that the Petitioner could open the door to the admission of his proffer statements and requested "that the [Petitioner] be specifically advised about potential admission of his proffer statements prior to the commencement of trial."

Later that day, the Petitioner filed a letter responding to the Government's December 31, 2008.  The letter stated that the proffer statements should be suppressed because the Petitioner had never been advised of the holding of the <u>Barrow</u> case and that the "boiler plate, non-negotiable proffer agreement is unconscionable on its face particularly if the court permits this belated and distorted use of it."  The Petitioner further added that if the Government was allowed to use the proffer statements, the Government's position would "clearly and reprehensibly deprive[] the [Petitioner] of the due process of law."

On January 5, 2009, the Petitioner filed a letter requesting an "emergency hearing" on the Government's intended use of the Petitioner's proffer statements.

Prior to the first trial, the Petitioner asked Liotti to request a plea offer from the prosecution.  The plea presented by the prosecution, on January 13, 2009, included an enhancement provision pursuant to 21 U.S.C. 851(a) based on a prior drug felony conviction, which, for the attempt count, increased the mandatory maximum from 20 to 30 years imprisonment, and for the conspiracy count, increased the mandatory minimum sentence to 10 years imprisonment and increased the maximum sentence to life imprisonment.  While Liotti asked the Prosecution to consider a lower maximum sentence, Liotti did not realize that it was error to include the § 851(a) enhancement because the Petitioner was never served with notice, as required by the statute, of the Prosecution's intent to rely on a prior conviction to increase any potential sentence.

Also, as part of the plea agreement, the Government stipulated to a sentence range of 151-188 months' imprisonment – 12.5 to 15.6 years – and agreed that the Petitioner could appeal and/or file a habeas petition if the sentence greater than 188 months' imprisonment was imposed.

Ultimately, a plea agreement could not be reached. A jury trial was held before Judge Wexler in January 2009. That trial ended in a mistrial because the jury could not reach a unanimous decision.

At the Government's request, a second jury trial was held before Judge Wexler in February 2009. Prior to the beginning of the second trial, the Petitioner moved to suppress the Petitioner's proffer statements, arguing that the Proffer Agreement was vague and did not apprise the Petitioner of the consequences of the Second Circuit decision in <u>Barrow</u>.

On February 5, 2009, Judge Wexler held a hearing on the voluntariness of the Petitioner's proffer statements, taking testimony from Special Agent Fitzpatrick, the Petitioner, and Murphy. During the hearing, the Petitioner admitted that he signed the Proffer Agreement voluntarily. (Transcript of Second Trial, ("T2"), 261.)

Murphy revealed that he was not aware of <u>Barrow</u> at the time of the Proffer Session. However, Murphy stated that he "read the proffer agreement, went over with [the Petitioner] any question that he might have had," <u>id.</u> at 289, and that during the Proffer session, "he would have to tell the truth and that he would – if somehow he made a misrepresentation in the court one way or another, whether himself or through others, that could be used against him, and perhaps what he said might be used against him. But [the Petitioner] appeared to understand that." (T2. 290-91.).

At the hearing, Liotti represented that neither he nor other defense counsel whom he had consulted had been aware of <u>Barrow</u>.

The Petitioner testified that the Government attorney St. Bernard told him "that if I were to take the stand and say something that was different than what I said in the proffer, that it could

be used against me." (T2 241.)  The Petitioner did not call St. Bernard, who conducted the proffer session, because the defense was unable to locate him.

In lieu of St. Bernard's testimony, the Government provided an affidavit from St. Bernard dated January 14, 2009 and offered to stipulate that no one from the Government advised the Petitioner about Barrow during the proffer.

At the end of the hearing, Judge Wexler found that the Petitioner "voluntarily went into [the proffer] agreement, he knew what he was doing, he was read the facts, and therefore my ruling stands the same as it did previously.  It comes in if there is an inconsistency." (T2. 328)

The second trial began on February 6, 2009.  At various points during the second trial, Liotti expressed difficulty hearing the witnesses and Judge Wexler.  According to Liotti, instead of accommodating him, Judge Wexler disparaged him in the presence of the jury.  Liotti memorialized his complaints in a letter to Judge Wexler dated February 9, 2009.

In terms of the evidence at the second trial, the Government called eight witnesses in its case-in-chief.  Two were cooperating witnesses, Omar Mims and Anthony Williams, who had been involved in cocaine trafficking with the Petitioner.  The Government also introduced corroborating evidence, including recorded telephone conversations between the Petitioner and his coconspirators; a consensually monitored and recorded jail house call from the Petitioner to his wife; telephone records; and other documentary evidence.  The Petitioner's sole witness was his wife, who testified regarding the jail house call with the Petitioner. (T2. 779-80.)

The evidence at the trial showed that, upon Anthony William's release from custody in 2005 for a federal narcotics conviction, he was reacquainted with the Petitioner, whom he had known prior to his incarceration. (T2. 576.)  Late in 2006, Williams approached the Petitioner and indicated that he was receiving wholesale quantity shipments of marijuana from Mexico and

distributing them. (T2. 584-85.)  The Petitioner purchased approximately 500 pounds of marijuana from Williams and told Williams that he was selling cocaine and wanted Williams to introduce him to a source of supply for cocaine. (T2. 585-87.)

In "early to mid" 2007, Williams introduced the Petitioner to Baldimir Martinez, Williams's supplier for marijuana who could also provide cocaine. (T2. 588-90.)  In the summer of 2007, the Petitioner obtained four kilograms of cocaine from Martinez through Williams at a price of $19,000 per kilogram. (T2. 591.)  After the four-kilogram transaction, the Petitioner wanted more cocaine from Martinez, so Williams arranged a meeting with the Petitioner, Martinez, and himself in late 2007 at the Petitioner's cell phone store in Brooklyn. (T2. 593-95.)  After the meeting, Martinez agreed to sell the Petitioner cocaine so long as Williams was involved in the deals as a trusted go-between. (T2. 598.)

The Petitioner and Williams discussed obtaining a truck to use for cocaine shipments from Texas to New York, which Martinez thought was a good idea. (T2. 599-601.)  To do so, the Petitioner told Williams that his friend Ricardo Dixon had a truck they could use and gave Williams the trucking paperwork to give to Martinez to use on the truck (T2. 601-05; GX 32.)  Dixon's truck was "no good," so the paperwork for that truck was used on a truck provided by Martinez for a shipment of cocaine in late December 2007. (T2. 605.)

For that transaction, Williams told the Petitioner that he would need someone to transport the cocaine.  The Petitioner sent his brother-in-law Vic, who picked up 20 kilograms of cocaine at a meeting place in the Bronx. (T2. 607-13.)  Williams told the Petitioner that he needed to take back ten kilograms of the cocaine and met the Petitioner at a Brooklyn car wash the day after Vic picked up the shipment, at which time the Petitioner returned ten kilograms of cocaine. (T2. 613-

15.)  Williams then met with Martinez, returned the ten kilograms of cocaine, and gave Martinez the paperwork for the truck. (T2. 615-16.)

On December 22, 2007, Williams met the Petitioner at his cell phone store and collected a partial payment of $184,000 for the ten kilograms of cocaine the Petitioner had purchased on a consignment basis from Martinez. (T2. 617.)  On December 23, 2007, Williams spoke to Martinez and indicated that he still needed to collect $26,000 from the Petitioner to complete payment. (T2. 617-18.)  Williams then met with the Petitioner, who gave Williams the remaining $26,000 owed to Martinez. (T2. 618-19.)  Later that day, Williams met Martinez at a rest stop in New Jersey and gave him the remaining $26,000. (T2. 620.)  Williams also noticed that the truck that had delivered the cocaine now bore the marking of the trucking paperwork provided by the Petitioner. (T2. 621-22.)

On December 25, 2007, the truck shipping the Petitioner's $210,000 payment for the ten kilograms of cocaine, which used Dixon's trucking paperwork information, was stopped in Texas; authorities seized approximately $977,000 after searching the vehicle. (T2. 510-15.)

In or about January 2008, the Petitioner called Williams and told him there was a problem, as the trucking paperwork provided by the Petitioner was used on the truck from which the money was seized and Dixon was "getting heat from law enforcement and his probation officer." (T2. 623-24.)  Because of the problems caused by the use of Dixon's paperwork, the Petitioner told Williams that Martinez would have to compensate him by providing him with more drugs at a cheaper price. (T2. 624-25.)  Williams relayed the message to Martinez, who assured Williams that he would "do something" for the Petitioner. (T2. 625.)

The Petitioner did not receive any new shipments of cocaine from Martinez in January or February of 2008, as Martinez needed time to recover from his losses due the seizure of the money on December 25, 2007. (T2. 625-26.)

While waiting for a new shipment of cocaine from Martinez, the Petitioner continued to sell cocaine to Mims, with whom he had dealt cocaine beginning in 2007. (T2. 427.) The Petitioner also supplied Mims with marijuana. (T2. 426.) Mims was introduced to the Petitioner through Mims' brother, Markese Bradley. (T2. 427-28.) In general, Mims ordered cocaine from the Petitioner in 100 to 200 gram quantities over the phone, using coded language. (T2. 428-31.) On March 12, 2008, the Petitioner called Bradley and attempted to sell him and Mims 200 grams of cocaine. (T2 434-36.)

On March 13, 2008, the Petitioner spoke to Bradley and advised him that he was involved in a cocaine transaction with Mims. (T2. 438-41.) Other intercepted calls in March and April 2008 between the Petitioner and Bradley showed the ongoing nature of the cocaine conspiracy involving the Petitioner, Bradley, and Mims. (T2 445-53.)

On March 19, 2008, at the Petitioner's store, the Petitioner and Williams used Bradley's cell phone to place a call to Martinez. Martinez apologized for using Dixon's paperwork on the truck carrying the seized cash and assured the Petitioner that he would send a new shipment of cocaine soon, some of which would be for the Petitioner. (T2 630-31.) Although the Petitioner vented frustration regarding the use of Dixon's paperwork on the truck, the Petitioner confirmed that a new cocaine shipment in the near future would be acceptable to him. (T2 630-32.)

On March 25, 2008, Williams met with the Petitioner at the Petitioner's cell phone store to discuss the next shipment of cocaine from Martinez. (T2 634.) Subsequent to that meeting, in late March or early April 2008, Martinez told Williams that a new shipment of cocaine was on its

way but that due to delays, Williams would have to go to Boston to pick up the cocaine from

Martinez. (T2 638-39.)  Williams and his friend Nick made the trip to Boston to retrieve the

cocaine. (T2 640-41.)

Martinez told Williams that 41 kilograms of cocaine in the shipment were for the

Petitioner but that he should give the Petitioner only "ten or twenty" of the kilograms. (T2 643.)

After Williams and Nick picked up the cocaine, Williams called the Petitioner and, using coded

language, told him that they had the cocaine and that he was on his way back to New York. (T2

643.)  Eventually, Williams took 20 kilograms of the cocaine from Martinez to the Petitioner's

partner Mason's house, where he gave the cocaine to the Petitioner. (T2 644-46.)

Shortly thereafter, the Petitioner called Williams and told him that he was having

problems with the cocaine, as it was poor quality and lost a lot of its weight when cooked into

crack. (T2 646-47.)  Williams returned to Mason's house so that the Petitioner could demonstrate

these problems. (T2 647-48.)  Williams called Martinez, who told him that he would let his

people in Mexico know about the problem but that Williams should not refund any money. (T2

647-48.)  Williams then met with Martinez and spoke about the shipment of poor quality

cocaine. (T2 650.)  Williams also gave Martinez a partial payment from the Petitioner of

$180,000 (T2 650.)  Williams also acknowledged that in the event he could not pay Martinez in

cash at a face-to-face meeting, he was supposed to pay Martinez through "bank drops." (T2.

651.)  About that time, Williams indicated that the Petitioner could pay Martinez by a series of

bank drops, which the Petitioner did on at least one occasion, depositing $5,000 into the account

of David Martinez (T2 651-55.)

Following the second trial, on February 10, 2009, the Petitioner was convicted of the

charges against him, namely, attempt to distribute and possession with intent to distribute

cocaine and conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine.

On February 17, 2009, the Petitioner filed a motion for a new trial pursuant to Federal Rules of Criminal Procedure ("Fed. R. Crim. P.") 33.

On August 28, 2009, the Petitioner moved pursuant to Fed. R. Crim. P. Rule 12(b)(3) to set aside the verdict/dismiss the indictment on the grounds that: (1) the indictment failed to allege essential elements of the either the attempt or the conspiracy charged; (2) the conduct upon which the indictment was founded did not constitute either the attempt or the conspiracy charged, and (3) the statute under which the Petitioner was prosecuted for an attempt was preempted, and therefore, could not be the basis for an indictment.

On December 14, 2009, the Court denied the Petitioner's motion to dismiss the indictment and to set aside the verdict.

Meanwhile, on November 16, 2009, the Probation Department filed a presentence report ("PSR") and a sentencing recommendation. In the PSR, the Petitioner's total offense level was determined to be 42. In particular, the Petitioner's base offense level was 36, plus a four-level enhancement for a leadership role and a two-level enhancement for obstruction of justice. The Petitioner's total offense level and Criminal History Category III provided a Guidelines range of 360 months to life. In the sentencing recommendation, the Probation Department recommended a prison sentence of 300 months.

On November 23, 2009, the Petitioner filed objections to the PSR claiming that the Government had never filed a prior felony information.

On December 28, 2009, the Government provided the Petitioner with a copy of the prior felony information that was stamped "Received in Clerk's Office U.S. District Court E.D.N.Y. Dec 22 2008 Long Island Office."

At some point, the Petitioner moved pursuant to Fed. R. Crim. P. 33(a) for a new trial.

On April 5, 2010, Judge Wexler denied the Petitioner's motion for a new trial. First, Judge Wexler found that the prosecution adduced sufficient evidence to convict the Petitioner at the second trial. Judge Wexler noted that "there was overwhelming evidence of a conspiracy between [the Petitioner] and the co-conspirators."

As to the voluntariness of the Petitioner's proffer statements, Judge Wexler noted that he previously held a hearing on this issue and found that the statements were made voluntarily. Judge Wexler also noted that the proffer statements were not used against the Petitioner at the second trial. Finally, Judge Wexler declined to order a new trial based upon his supposed adversarial demeanor toward the defense counsel at the second trial.

Also, on April 5, 2010, at the Petitioner's initial sentencing, Judge Wexler, found that the Petitioner had organized the activities of individuals in a criminal conspiracy involving at least five participants, including himself. Thus, Judge Wexler found that the four-level enhancement for a leadership role was warranted. However, Judge Wexler determined that a two-level enhancement for obstruction of justice was not warranted. The Prosecution conceded that the Petitioner may not have been properly served with the requisite notice and specifically asked that this enhancement not be applied to his sentence.

Ultimately, Judge Wexler applied a total offense level forty and a Criminal History Category of III, which provided a Guidelines range of 360 months to life. Nonetheless, Judge Wexler sentenced the Petitioner to 240 months, twenty years imprisonment on both counts, to

run concurrently. Judge Wexler also sentenced the Petitioner to a term of supervised release of four years on the distribution count and five years on the conspiracy count, to run consecutively, for a total of nine years.

On appeal, the Petitioner raised several reasons to support his contention that the judgment of conviction should be overturned. Among these reasons were the following: (1) the verdict in his case was based on legally insufficient evidence; (2) the District Court erred by holding portions of the Petitioner's proffer statements admissible at trial, in reliance on Barrow; and (3) he received ineffective assistance from Murphy. The Petitioner's claim for ineffective assistance of counsel centered on the failure of Murphy to apprise him of the ramifications of the Barrow decision.

On December 19, 2011, the Second Circuit (1) affirmed the judgment of conviction, (2) vacated the sentencing portion of the April 5, 2010 judgment for reasons not relevant here; and (3) remanded the case solely for a limited resentencing proceeding. United States v. Murph, 452 Fed. Appx. 31 (2011). As to the sufficiency of the evidence, the Second Court noted as follows:

> At trial, the government presented numerous phone conversations between [the Petitioner] and his co-conspirators in which they discussed their activities in the drug trade. [The petitioner] argues that, because some of the conversations were in code, the jury could not rationally have believed that they referred to drug trafficking. However, both Agent Fitzpatrick and Omar Mims, one of [the Petitioner']s alleged co-conspirators, testified to the true meaning of the coded conversations. The [G]overnment also presented evidence that [the Petitioner] had provided the means for at least one shipment of cocaine to be transported by truck from Texas to New York City. In view of the strong weight of the [G]overnment's evidence, we cannot say that no rational trier of fact could have found that [the Petitioner] was guilty beyond a reasonable doubt.

Id. at 34 (internal footnote omitted).

With regard to the proffer statements, the Second Circuit held that

> [a]lthough a defendant is free to argue that the prosecution has not met its burden of proof as to specific elements of the charged crime, or to challenge in general terms the credibility of a prosecution witness, he is not free to elicit facts that directly contradict statements that he made in his proffer session. Any attempt to elicit such facts runs a strong risk of opening the door to the admission of the proffer statements.
>
> [The Petitioner] did not seek to "simply challenge[ ] the sufficiency of government proof," or to ask questions "that go [ ] to the credibility of the government's witness." Rather, the questions [the Petitioner] would have sought to ask the prosecution witness would have been calculated to elicit facts directly contradicting the statements made by [the Petitioner] during his proffer session. In these circumstances, the District Court did not abuse its discretion by warning [the Petitioner] that, by putting forward his alternate factual theory in the course of examining the witness, he would open the door to the admission of his proffer statements.

Id. at 34-35 (internal citations omitted). Further, the Court declined to hear the Petitioner's ineffective assistance of counsel claim on direct review because "the record [wa]s insufficiently developed to allow [the Court] to resolve" that claim. Id. at 36 n. 8.

On February 3, 2012, the Second Circuit denied the Petitioner's request for a hearing or rehearing *en banc*. On April 30, 2012, the Supreme Court of the United States denied the Petitioner's request for a writ of certiorari. Murph v. United States, 132 S. Ct. 2116, 80 USLW 3613 (2013).

While the Petitioner's request for a writ of certiorari was pending before the Supreme Court, he was resentenced by Judge Wexler on April 4, 2012 in accordance with the directives set forth by the Second Circuit. In particular, Judge Wexler again sentenced the Petitioner to 240 months of imprisonment on each count, to run concurrently. The Second Circuit affirmed the amended sentence on May 2, 2012.

On April 29, 2013, the Petitioner brought the instant habeas petition pursuant to 28 U.S.C. § 2255 to vacate, set side, or correct the sentence on the basis of ineffective assistance of counsel. In particular, the Petitioner contends that he was denied effective assistance of counsel

because (1) Murphy allowed him to proffer with the Government without knowing the specific holding of Barrow or advising the Petitioner about the holding of that case; (2) Liotti had hearing difficulties during the second trial; and (3) Liotto failed to object to an improper sentencing enhancement that was contained in a proposed plea agreement with the Government.

Although the Petitioner did not raise the second and third claims on direct appeal of his underlying conviction and sentence, the Court notes that "claims of ineffective assistance of counsel 'may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal.'" Castro v. United States, 12-CV-5024 (ADS), 2014 WL 320476, at *4 (E.D.N.Y. Jan. 29, 2014)(Spatt, J.), quoting Massaro v. United States, 538 U.S. 500, 504, 123 S. Ct. 1690, 155 L. Ed .2d 714 (2003).

On March 26, 2014, Judge Wexler held a status conference with the parties in the habeas case. Judge Wexler reviewed some of the allegations in the habeas petition, including the allegations that, during the second trial, Judge Wexler refused to accommodate Liotti's hearing difficulties. According to Liotti, on numerous occasions, Judge Wexler disparaged him for his hearing difficulties, thereby chilling Liotti's ability to question witnesses and request the prosecution to repeat their comments, "for fear of inviting further adverse comments from the court." In light of these allegations, Judge Wexler recused himself from the habeas case. That day, the habeas case was transferred to this Court, which now addresses the underlying petition.

## II. DISCUSSION

Section 2255(a) of Title 28 of the United States Code provides that

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may

16

> move the court which imposed the sentence to vacate, set aside or correct the
> sentence.

In considering a § 2255 petition, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). On the other hand, if it "plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (citation and internal quotation marks omitted).

To prevail on a claim of ineffective assistance of counsel, the petitioner must show that (1) his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) he was prejudiced by counsel's deficient performance. See Strickland v. Washington, 466 U.S. 668, 687–96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

As to the first prong of the Strickland test, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel. Id. at 688–89, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that [t]here are countless ways to provide effective assistance in any given case and that [e]ven the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (internal quotation marks omitted) (citing Strickland, 466 U.S. at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674).

As to the second prong, the Petitioner must show that, but for the deficient performance, there is a reasonable probability that the result would have been different. Strickland, 466 U.S. at

694, 104 S. Ct. 2052 80 L. Ed. 2d 674. More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674. The Second Circuit has rejected § 2255 petitions based on ineffective assistance of counsel because a petitioner is unable to show prejudice in light of "overwhelming evidence of guilt adduced at trial." Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991); see United States v. Simmons, 923 F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against him, there is little reason to believe that alternative counsel would have fared any better."); United States v. Reiter, 897 F.2d 639, 645 (2d Cir. 1990) (similar).

The Court now addresses the Petitioner's three main grounds for his ineffective assistance of counsel claim.

A. As to Whether Murphy, the CJA-Appointed Attorney, Rendered Constitutionally Ineffective Assistance of Counsel

As noted above, the Petitioner argues that Murphy, his CJA-appointed lawyer, was ineffective in May 2008 by allowing the Petitioner to proffer – i.e. admit his guilt to the charges contained in the complaint and other criminal conduct regarding the Petitioner's cocaine trafficking conspiracy in the hopes of obtaining a cooperation agreement with the Government – without knowing the specific holding of Barrow and specifically failing to advise the Petitioner of that holding. This argument is without merit.

In Barrow, the Second Circuit examined a proffer agreement with almost identical waiver language to that in this case and addressed the question of what factual assertions would trigger the waiver provision. 400 F.3d 109, 116–121 (2d Cir. 2005). The Second Circuit concluded that the clause "any evidence offered or elicited, or factual assertions made, by or on behalf of [the

defendant]" applied to all factual assertions, including those made directly during opening argument or indirectly through cross-examination. Id. at 118.

It is true that the "failure of an attorney to inform his client of the relevant law clearly satisfies the first prong of the Strickland analysis." Hill v. Lockhart, 474 U.S. 52, 62, 106 S. Ct. 366, 372 (1985). However, in this case, the Court finds that, notwithstanding Murphy's admitted lack of knowledge about the Barrow holding, the plain terms of the Proffer Agreement afforded the Petitioner notice that his protection from the Prosecution's use of his proffered statements could be waived by statements his attorney made during opening arguments, closing arguments, or on cross-examination. United States v. Gomez, 210 F. Supp. 2d 465, 476 (S.D.N.Y. 2002) ("[The Defendant's attorneys] were [] put on notice that if they presented arguments or evidence that specifically contradicted [the Defendant]'s proffer statements, the Government would be permitted to present [the Defendant]'s own words in rebuttal - as he agreed."). In other words, the Court finds that knowledge of Barrow was not necessary to understand the implications of language that essentially mirrors what the Second Circuit held in Barrow was "unambiguous."

In particular, Paragraph 3(C) the Proffer Agreement provides that the Government could use any statements made by the Petitioner "as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the Petitioner] at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing)." On its face, there is nothing in this provision that could have reasonably been interpreted by the Petitioner or his counsel as limiting the Government's use of the proffer statements to contradict testimony by the Petitioner. Rather, the references to "any" evidence indicates the parties' intent to create an expansive waiver. See generally Department of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 131, 122 S. Ct. 1230, 152 L. Ed. 2d 258 (2002) (noting that

when used in a statute, "'the word "any" has an expansive meaning'" (quoting <u>United States v.</u>

<u>Gonzales</u>, 520 U.S. 1, 5, 117 S. Ct. 1032, 137 L. Ed. 2d 132 (1997).  Similarly "indicative of the

parties' expansive intent is their extension of the waiver beyond formally admitted evidence to

'any . . . factual assertions' made by [the Petitioner] or on his behalf at any stage of the

prosecution." <u>Barrow</u>, 400 F.3d at 118, citing <u>Collazos v. United States</u>, 368 F.3d 190, 199 (2d

Cir. 2004) ("[W]hen, as here, the two words at issue are connected by 'or' rather than 'and,' and

when no commas set off the second word to suggest that it stands in apposition to the first, we

construe the disjunctive words to convey different meanings.").

    Further, construing this provision in the context of the other waiver scenarios provided by

the Proffer Agreement lends support to the Government's interpretation of the agreement.  In this

regard, Paragraph 3(B) of the Proffer Agreement expressly provides that the proffer statements

may be used by the Government "as substantive evidence to cross-examine [the Defendant],

should [the Defendant] testify."  If, as the Petitioner contends, Paragraph 3(C) limited the

Government's use of the Proffer statements to contradictory testimony given by the Petitioner,

Paragraph 3(B) would be superfluous. <u>United States v. Pelletier</u>, 898 F.2d 297, 302 (2d Cir.

1990) (holding that the scope of use immunity provided in a proffer agreement is governed by

contract law principles).

    With respect to the Petitioner's argument regarding prejudice, the Petitioner contends that

even though the Government did not use the proffer statements against him at trial, he was still

prejudiced because his trial counsel could not argue "actual innocence."  The Court rejects this

argument.  As the Government aptly notes, the Petitioner is "effectively complaining that had he

not proffered, his retained lawyer could have attempted to suborn perjury on his behalf." (Gov

Ltr, at 4.)  However, "[t]he [C]ourt is reluctant to find that failing to suborn perjury constitutes

ineffective assistance of counsel" or a cognizable basis of prejudice. <u>Adeyi v. United States</u>, 06 CV 1454 (ARR), 2007 WL 203962, at * 7 (E.D.N.Y. Jan. 24, 2007).

Even if the Petitioner made the required showing of constitutionally deficient performance of Murphy, the Court finds that the Petitioner has failed to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. The "reasonable probability" standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 791, 178 L. Ed. 2d 624 (2011)). The Court notes that Judge Wexler characterized the evidence of conspiracy against the Petitioner as "overwhelming." Also, the Second Circuit, in concluding that it could not find that no rational trier of fact could find the Petitioner guilty of the charges beyond a reasonable doubt, referenced "the strong weight of the [G]overnment's evidence."

Tellingly, the Petitioner devotes few lines of his papers to disputing the Government's version of the underlying events. On the Court's own review of the record, the evidence adduced at the Petitioner's second trial, which included wiretapped phone calls between the Petitioner and his conspirators; testimony concerning the cocaine trafficking conspiracy from two of the coconspirators; paperwork for a truck to help transport the cocaine from Texas to New York; and documentary evidence for a wire transfer of drug proceeds, provided substantial direct and circumstantial evidence of the Petitioner's guilt beyond a reasonable doubt. The fact that the first trial resulted in a hung jury has little, if any, bearing on the Petitioner's ability to establish prejudice in the second trial.

For these reasons, the Court denies the Petitioner's habeas petition on the ground that Murphy rendered constitutionally deficient assistance of counsel in failing to be aware of the Barrow holding and failing to communicate the consequences of this decision to the Petitioner.

B. As to Whether the Petitioner's Trial Counsel, Liotti, Rendered Constitutionally Ineffective Assistance of Counsel Due to his Hearing Difficulties

The Petitioner also asserts that Liotti's alleged hearing difficulties – in particular, his problems hearing Judge Wexler and certain witnesses at times – during the second trial compromised his ability to effectively represent the Petitioner. As an initial matter, the Court notes that, during the second trial, the Petitioner, in a letter to Judge Wexler, acknowledged that the Government and the Government witnesses made a concerted effort to accommodate Liotti's hearing difficulties. Fahringer Decl. Exh H, at 2 ("I have personally thanked Ms. Gatz and Mr. Rose for not taking advantage of this problem. They have kept their voices up and I believe have asked their witnesses to do likewise. I am very grateful for that professional courtesy.").

Nonetheless, even if the Petitioner made the required showing that Liotti's alleged hearing difficulties compromised his ability to render effective assistance of counsel for the Petitioner, the Court finds, for the reasons explained above, that he has failed to establish prejudice as required by Strickland. In the Court's view, the evidence introduced at the second trial defeat the Petitioner's conclusory argument that a "reasonable probability" exists that, but for Liotti's hearing difficulties, the result of the trial would have been different. In addition, the Court notes that, at the second trial, the Petitioner was also represented by Smith, for whom no allegation of hearing difficulties is made. Accordingly, the Court denies the Petitioner's habeas petition on the ground that Liotti rendered constitutionally deficient assistance of counsel due to his hearing difficulties at the second trial.

C.  As to Whether Liotti, the Petitioner's Trial Counsel, Rendered Constitutionally Ineffective Assistance of Counsel Due to His Failure to Object to the Improper Sentencing Enhancement in the Plea Offer

The Petitioner also argues that Liotti was ineffective for failing to object to the improper inclusion of a sentencing enhancement in the plea offer, pursuant to 21 U.S.C. § 851, where the Prosecution never served the Petitioner with the required notice of its intention to rely on a prior conviction to seek a greater sentence.

Title 21, section 851(a)(1) of the United States Code provides:

No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

Filing and service of information is a "condition precedent to a court's authority to impose a statutorily enhanced sentence." Sapia v. United States, 433 F.3d 212, 217 (2d Cir. 2005).

The Government counters that Liotti's omission was not an error because, if notified of the defect, the Government could have perfected service of the Prior Felony Information prior to the trial.  However, as acknowledged by the Government, the statutorily required notice must be served "before trial," which the Second Circuit has interpreted as prior to the commencement of jury selection. United States v. White, 980 F.2d 836, 842 (2d Cir. 1992)(construing 21 § 851(a)(1)).

Here, the trial began, for purposes of 21 U.S.C. § 851, with jury selection on January 12, 2009.  Therefore, by the time Liotti received the erroneous plea agreement on January 13, 2009, the time to serve the notice had already passed.

"'Where defense counsel fails to object to an improper enhancement under the Sentencing Guidelines, counsel has rendered ineffective assistance.'" United States v. Otero, 502

F.3d 331, 336 (3d Cir. 2007) (citation omitted).  Accordingly, the Court finds that Liotti rendered

ineffective assistance of counsel to the Petitioner by failing to recognize the failure of the

Government to properly serve the Prior Felony Information.

> With respect to prejudice,
>
> > a defendant must show that but for the ineffective advice of counsel there is a
> > reasonable probability that the plea offer would have been presented to the court
> > (i.e., that the defendant would have accepted the plea and the prosecution would
> > not have withdrawn it in light of intervening circumstances), that the court would
> > have accepted its terms, and that the conviction or sentence, or both, under the
> > offer's terms would have been less severe than under the judgment and sentence
> > that in fact were imposed.

Lafler v. Cooper, ____, 566 U.S. __ , 132 S. Ct. 1376, 1385, 182 L. Ed. 2d 398 (2012).  So that,

the "defendant must show the outcome of the plea process would have been different with

competent advice." Id. at 1384.

The Petitioner alleges that Liotti's failure to object to the erroneous enhancement

prejudiced him because (1) otherwise, the Government would have offered him a more attractive

plea offer; (2) the Petitioner was "forced" to proceed to trial and risk the greater punishment

"customarily imposed when the prosecution is compelled to prove its case" (Pet's Reply Brf, at

7.); and (3) the sentence imposed after trial was more severe than the sentences imposed by

Judge Wexler on the Petitioner's co-conspirators.

In particular, the Petitioner contends that he would have accepted a plea offer that

provided for the proper sentencing range, including a 5-year minimum and no life sentence on

the conspiracy count.  However, the Petitioner maintains that he could not accept a plea offer that

exposed him to a potential sentence of life imprisonment.  Similarly, the Petitioner contends that

he could not accept an offer where a court would be bound by statute to sentence him to at least

10 years imprisonment.

However, "there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial." Weatherford v. Bursey, 429 U.S. 545, 561, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977); see also United States v. Williams, CRIM. 88-410 (SSH), 1999 WL 1212883, at *5 (D.D.C. Oct. 25, 1999) ([B]ecause the government was under no obligation to offer a conditional plea, it is uncertain whether it would have consented to one in the first place.").  Indeed, there is no indication that the Government would have been willing to make such a plea offer without a § 851 enhancement, particularly in light of the strong weight of the evidence against the Petitioner. For that reason, the Court finds that while the Petitioner received ineffective assistance of counsel with respect to Liotti's failure to object to the sentencing enhancement in the rejected plea offer, it is not clear what prejudice, if any, the Petitioner suffered as a result.

In this regard, the Supreme Court of the United States has made clear that there can be no ineffective assistance of counsel claim if, as here, there is no actual plea offer that, but for the attorney's deficient assistance, would, with reasonable probability, have been accepted by the Defendant. Lafler, 132 S. Ct. at 1387 (("[I]f no plea offer is made, or a plea deal is accepted by the defendant but rejected by the judge, the issue raised here [of ineffective assistance of counsel] simply does not arise."); see also Ortega v. United States, 09 CIV. 608 (LTS)(GWG), 2012 WL 2478277, at *11 (S.D.N.Y. June 27, 2012) ("*If* a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. Lafler, 132 S. Ct. at 1387.")(emphasis added), report and recommendation adopted, 09 CIV. 608 (LTS)(GWG), 2013 WL 81330 (S.D.N.Y. Jan.8, 2013).

In short, while the Court finds that the Petitioner has established ineffective assistance of counsel due to Liotti's failure to object to the sentencing enhancement in the rejected plea offer, the Petitioner has failed to establish prejudice as required by Strickland.

## III.    CONCLUSIONS

To the extent the Petitioner separately argues, for the first time in reply, that Liotti failed to explain to him the terms of the rejected plea agreement, the Court notes that this theory of ineffective assistance of counsel could support a habeas claim.  However, "[i]n the present case, [the Petitioner] offer[s] nothing other than conclusory allegations and bald assertions about his attorney failing to tell him and advise him about [the terms of the rejected] plea bargain offer[], which are insufficient to support a petition for a writ of habeas corpus."  Davis v. Dir., TDCJ-CID, CIV.A. 6:07-CV-397, 2008 WL 1786974, at *9 (E.D. Tex. Apr. 18, 2008), aff'd sub nom. Davis v. Thaler, 373 F. App'x 446 (5th Cir. 2010).

The Court also denies the Petitioner's request for an evidentiary hearing. Abad v. United States, 09 CIV. 8985 (GBD), 2014 WL 521541, at *1 (S.D.N.Y. Feb. 6, 2014)("The facts as alleged by Petitioner in his habeas petition fail to state any viable claim for relief. Therefore, no further evidentiary inquiry was necessary prior to denial.").

In sum, with respect to the Petitioner's habeas petition on the basis that Murphy was ineffective for allowing him to proffer with the Government without knowing the specific holding of Barrow, the Court denies the petition.  Similarly, the Court denies the Petitioner's habeas petition on the grounds that that he was denied effective assistance of counsel due to Liotti's purported hearing difficulties at the second trial.  Finally, while the Court finds that the Petitioner has established ineffective assistance of counsel due to Liotti's failure to object to the sentencing enhancement in the rejected plea offer, the Petitioner has failed to establish prejudice as required by Strickland.  Accordingly, the Petitioner's § 2255 habeas petition is dismissed in its entirety, and the Clerk of the Court is instructed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
April 17 , 2014


_____*Arthur Spatt*_____
ARTHUR D. SPATT
United States District Judge